**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| MICHAEL VRIENS and NICHOLAS BARDSLEY, *individually and on behalf of all others similarly situated*, | ) | |
| Plaintiff, | ) | No. 2:23-cv-06797-DCN |
| vs. | ) | **ORDER** |
| D.R. HORTON, INC., *et al.*, | ) | |
| Defendants. | ) | |
| D.R. HORTON, INC., | ) | |
| Crossclaim Plaintiff, | ) | |
| vs. | ) | |
| TIP-TOP ROOFING & CONSTRUCTION, LLC, *et al.*, | ) | |
| Crossclaim Defendants. | ) | |

The following matter is before the court on defendant D.R. Horton, Inc.'s ("D.R. Horton") amended motion to compel arbitration as to plaintiff Nicholas Bardsley ("Bardsley"), ECF No. 215. For the reasons set forth below, the court denies the motion.

## I. BACKGROUND

### A. Factual Background

This putative class action concerns the allegedly defective installation of roofs on many homes throughout the coastal region of South Carolina. ECF No. 358, 3d Amend. Compl. ¶¶ 10, 20. Named plaintiffs Michael Vriens ("Vriens") and Bardsley (together,

"Plaintiffs") bring this action against D.R. Horton—the primary contractor responsible for construction of their homes. See id. ¶¶ 6, 9. Plaintiffs also name many of D.R. Horton's subcontractors as defendants. See id. ¶¶ 12–16.

Vriens is an "upstream purchaser," representing a putative class of individuals who purchased a home directly from D.R. Horton. Id. ¶ 2. Vriens entered into a purchase agreement with D.R. Horton to purchase his home, and the court compelled arbitration of Vriens's claims pursuant to an arbitration provision in that agreement.[1] See ECF Nos. 1124, 1176. Bardsley is a "downstream purchaser," representing a putative class of individuals who did not purchase their homes directly from D.R. Horton but, instead, bought their homes from individuals after the initial sale. Id. ¶ 4. Bardsley, therefore, never entered into a purchase agreement with D.R. Horton for the purchase of a home. See id.

Bardsley resides the in the D.R. Horton-developed Heather Glen Community. ECF No. 1074 at 4. D.R. Horton maintains that Bardsley's claims are still subject to arbitration pursuant to an arbitration provision found in the covenants, conditions, and restrictions (the "CCRs") applicable to properties in Heather Glen or, alternatively, pursuant to the purchase agreement the original purchaser of his home entered into with D.R. Horton under a theory of equitable estoppel. ECF No. 1054 at 5–6, 10–11; see also ECF No. 1074-1 at 34 (Arbitration provision in Heather Glen CCRs).

---

[1] The court also compelled arbitration of D.R. Horton's crossclaims against its subcontractors. See ECF No. 1124

**B. Procedural History**

Plaintiffs initially filed suit in the Charleston County Court of Common Pleas on October 30, 2023. ECF No. 1-1; Vriens et al. v. Tip-Top Roofing & Constr., LLC et al., No. 2023-CP-10-05346 (Charleston Cnty. Ct. C.P. Oct. 30, 2023). On December 19, 2023, D.R. Horton removed the action to this court pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), 1453, 1711–1715. On December 22, 2023, D.R. Horton moved to compel arbitration and stay proceedings pursuant to the Federal Arbitration Act ("FAA") and the South Carolina Uniform Arbitration Act ("SCUAA"). ECF No. 5-1. D.R. Horton filed an amended motion to compel arbitration and stay proceedings on December 18, 2024. ECF No. 215 at 4. This motion sought to compel arbitration of both the Vriens's and Bardsley's claims against D.R. Horton. ECF No. 215 ¶¶ 2, 10. Plaintiffs filed their third amended complaint on February 27, 2025, which is the operative complaint. See ECF No. 358, 3d Amend. Compl. Plaintiffs assert causes of action therein for negligence, gross negligence, and breach of implied warranties. Id. ¶¶ 71–85.

When the court initially ruled on D.R. Horton's amended motion to compel arbitration as to Vriens on September 4, 2025, the court also ordered supplemental briefing on the issue of whether Bardsley must submit his claims to arbitration. ECF No. 1000 at 21. D.R. Horton filed its supplemental briefing on October 30, 2025. ECF No. 1054. Bardsley filed his supplemental briefing on November 13, 2025. ECF No. 1074. D.R. Horton replied to Bardsley's supplemental briefing on January 16, 2026. ECF No. 1107. The court held a hearing on whether Bardsley must submit his claims to arbitration on January 26, 2026. ECF No. 1113.

Plaintiffs filed a letter notifying the court of additional authority on September 8, 2026, ECF No. 1179, to which D.R. Horton responded on September 11, 2026, ECF No. 1182. In his letter, Bardsley raised the issue of whether D.R. Horton had standing to enforce the CCRs against remote grantees, like Bardsley, because D.R. Horton had not shown that it retained ownership of real property within Heather Glen.[2] ECF No. 1179 at 2. The court then entered a text order on September 30, 2026, requiring D.R. Horton to produce documentation demonstrating that it retained a sufficient interest to enforce the CCRs under South Carolina law. ECF No. 1184. D.R. Horton responded to the court's order with documentation and briefing on the issue. ECF No. 1185. Bardsley replied with his own supplemental briefing, ECF No. 1187, to which D.R. Horton moved for leave to file a sur-reply, ECF Nos. 1188, 1188-1. The court granted that motion on October 29, 2026, and D.R. Horton filed its sur-reply that same day. ECF Nos. 1189, 1190. Briefed ad nauseum, the motion to compel arbitration as to Bardsley is now ripe for the court's review.

## II. DISCUSSION

### A. Equitable Estoppel

The court first addresses D.R. Horton's contention that Bardsley can be compelled to arbitrate his claims under a theory of equitable estoppel. It claims that Bardsley should be compelled to arbitrate pursuant to the purchase agreement that his predecessor in interest entered into with D.R. Horton. See ECF No. 1054 at 10–14. At the outset, the court notes that D.R. Horton has not provided the court with the purchase

---

[2] D.R. Horton does not dispute that Bardsley is a remote grantee. See ECF Nos. 1185, 1188-1.

agreement that Bardsley's predecessor in interest purportedly entered into with it. Because D.R. Horton has not provided any agreement under which Bardsley could be equitably estopped from refusing to arbitrate, it cannot prevail on its equitable estoppel argument. The court will not compel arbitration pursuant to a phantom arbitration provision.

The court also finds that, even if presented with the relevant agreement, D.R. Horton's argument would still fail on the merits. South Carolina law recognizes that a non-signatory may be bound by an arbitration agreement under a "direct benefits" estoppel theory. See Wilson v. Willis, 827 S.E.2d 167, 173–74 (S.C. 2019). Direct benefits estoppel prevents a non-signatory "from refusing to comply with an arbitration clause when it receives a direct benefit from a contract containing an arbitration clause." Id. (quoting Pearson v. Hilton Head Hosp., 733 S.E.2d 597, 601 (S.C. Ct. App. 2012) (quotation marks omitted)). Stated differently, "the doctrine recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." Wilson, 827 S.E.2d at 175 (emphasis in original) (quotation marks and citation omitted). To be estopped in this manner, the non-signatory must "knowingly exploit[ ] the benefits of an agreement containing an arbitration clause, and receive[ ] benefits flowing directly from that agreement." Id. (quotation marks and citation omitted). The relevant inquiry is thus whether Bardsley, by initiating this lawsuit, is seeking a direct benefit from the purchase agreement apparently entered into between D.R. Horton and his predecessor in interest. See id.; see also R.J. Griffin Co. v. Beach Club II Homeowners Ass'n, 384 F.3d 157, 162

(4th Cir. 2004) (applying South Carolina law and considering relevant inquiry to be whether the non-signatory plaintiff was "seeking a direct benefit from the construction contract" at issue).

Bardsley argues that his claims against D.R. Horton exist independently of the purchase agreement between D.R. Horton and his predecessor in interest, which precludes application of direct benefits estoppel. See ECF No. 1074 at 20–21. The court agrees. Again, Bardsley asserts claims for negligence, gross negligence, and breach of implied warranties. 3d Amend. Compl. ¶¶ 58–70.

As for negligence and gross negligence, the South Carolina Supreme Court has stated that "a cause of action in negligence will be available where a builder has violated a legal duty." Kennedy v. Columbia Lumber & Mfg. Co., 384 S.E.2d 730, 737 (S.C. 1989). The Kennedy Court further explained:

> A violation of a building code violates a legal duty for which a builder can be held liable in tort for proximately caused losses. [South Carolina law also] imposes a legal duty on builders to undertake construction commensurate with industry standards. Where a building code or industry standard does not apply, public policy further demands the imposition of a legal duty on a builder to refrain from constructing housing that he knows or should know will pose serious risks of physical harm.

Id. (citation omitted). Bardsley's claim stems from D.R. Horton and its subcontractors allegedly installing roofs with "non-compliant underlayment and non-compliant underlayment fastener patterns." 3d Amend. Compl. ¶¶ 24, 61 (emphasis omitted). Kennedy makes clear that a plaintiff alleging violations of a building code has a cause of action in tort for negligence. See Kennedy, 384 S.E.2d at 737; see also R.J. Griffin & Co., 384 F.3d at 162 (rejecting argument that plaintiff could be compelled to arbitrate a negligence claim under a theory of direct benefits estoppel because "South Carolina

common law legal duties" arose from the builder's "role as the builder" and were "not dependent on the terms of the general contract."). As such, Bardsley's negligence and gross negligence claims are "not dependent on the terms" of any purchase agreement, and he therefore cannot be compelled to arbitrate pursuant those claims pursuant to the terms of any such purchase agreement. See R.J. Griffin & Co., 384 F.3d at 162.

As for Bardsley's claim for breach of implied warranties, the South Carolina Supreme Court has likewise specified that this warranty stems from a contractor's role as the builder, and not "from the construction contract to which the builder is a party." Kennedy, 384 S.E.2d at 736; see also 17 S.C. Jur. Constr. Law § 54 ("[A] contractor who constructs a dwelling impliedly warrants that the work will be performed in a careful, diligent, workmanlike manner."). Accordingly, Bardsley's breach of implied warranties claim does not depend on any purchase agreement, and, as a result, he cannot be compelled to arbitrate that claim pursuant to an arbitration provision in any such purchase agreement.[3] See R.J. Griffin & Co., 384 F.3d at 162 (concluding that plaintiff could not be compelled to arbitrate its negligence and implied warranties claim against builder under South Carolina's doctrine of direct benefits estoppel). Because Bardsley cannot be

---

[3] D.R. Horton relies on the South Carolina Court of Appeals' decision in Dixon v. Pattee to argue that Bardsley can be bound under a theory of equitable estoppel. ECF No. 1054 at 12 (citing 898 S.E.2d 158, 170–72 (S.C. Ct. App. 2023)). The court in Dixon emphasized that the plaintiffs had pleaded that the defendant had "impliedly and/or expressly warranted" that the home would meet a certain standard workmanship. 898 S.E.2d at 171 (emphasis in original). Bardsley does not assert a claim for breach of express warranties however, see ECF No. 358, and while Dixon did not address the word "impliedly," Kennedy—a decision of the South Carolina Supreme Court—leaves no doubt that an implied warranty claim does not arise from a contractual relationship. See Dixon, 898 S.E.2d at 171–72; Kennedy, 384 S.E.2d at 736 (emphasizing that "privity of contract as a defense to an implied warranty action is abolished in this State."). The court thus finds D.R. Horton's reliance on Dixon to be unavailing.

compelled to arbitrate under a theory of direct benefits estoppel, the court proceeds to address whether arbitration can be compelled pursuant to the CCRs.

**B. Enforceability of CCRs Against Remote Grantees**

Next, the court addresses whether Bardsley can be compelled to arbitrate pursuant to the arbitration provision contained in the CCRs. Bardsley argues that D.R. Horton lacks standing to enforce the CCRs under South Carolina law, as it no longer owns property in Heather Glen. ECF No. 1179 at 2. The court agrees with Bardsley for the reasons that follow.

**1. Timeliness**

As an initial matter, the court addresses whether Bardsley's argument is timely. Bardsley first argued that D.R. Horton lacked standing to enforce the CCRs in a letter notifying the court of "supplemental authority" filed on September 8, 2026. Id. Bardsley specifically referenced an order recently issued by the South Carolina Court of Common Pleas, in which that court denied D.R. Horton's motion to compel arbitration as to downstream purchasers in the same position as Bardsley.[4] See ECF No. 1179-1. Bardsley noted in his letter that he had previously argued, on pages 9 and 10 of his supplemental response brief, that D.R. Horton had not shown that it owns real property benefited by the CCRs. ECF No. 1179 at 2. However, Bardsley did not make this argument on pages 9 and 10 of his supplemental response. See ECF No. 1074 at 9–10. This portion of his briefing primarily argues that the CCRs are not enforceable due to non-compliance with traditional contract formation requirements. Id. Obvious as it may

---

[4] The Court of Common Pleas that issued this order was vested with jurisdiction over all of D.R. Horton's pending motions to compel arbitration across a number of lawsuits filed against it in state court. ECF No. 1179 at 1.

be, the court notes that the Court of Common Pleas applied precedent that Bardsley could have relied upon in prior briefing, and the order did not establish new law on the issue of when a grantor has standing to enforce a covenant against a remote grantee. See ECF No. 1179-1 at 7–8. As such, Bardsley's standing argument is not timely, and the court would typically consider it waived. See United States v. Smalls, 720 F.3d 193, 197 (4th Cir. 2013).

That said, the court has discretion to consider waived arguments "under appropriate circumstances." See De Simone v. VSL Pharms., Inc., 36 F.4th 518, 531 (4th Cir. 2022). One such circumstance is when the party contesting an untimely argument is permitted to oppose the argument in a sur-reply. Id. ("[O]pportunity to contest an untimely argument in a sur-reply supports a district court's decision to consider the untimely argument."). Here, D.R. Horton has filed briefing in response to the court's request for documentation and also been given the opportunity to file a sur-reply. ECF Nos. 1185, 1190. As such, the court has discretion to entertain the argument. See De Simone, 36 F.4th at 531. Considering the voluminous briefing submitted on the merits of whether Bardsley can be compelled to arbitrate, the court declines to look past an important issue that has been fully briefed. Accordingly, the court will consider Bardsley's untimely argument.

**2. Analysis**

The South Carolina Supreme Court held in McLeod v. Baptiste that a "grantor lacks standing to enforce a covenant against a remote grantee when the grantor no longer owns real property which would benefit from the enforcement of that restrictive

covenant."[5] 433 S.E.2d 834, 835 (S.C. 1993). In response to the court's request for documentation, D.R. Horton all but concedes that it no longer owns property in Heather Glen, and it provides no documentation suggesting otherwise. See ECF No. 1185 at 7 (noting that it "may no longer be a fee simple owner of property within Heather Glen[.]"). Thus, a straightforward application of McLeod appears to foreclose D.R. Horton's attempt to compel arbitration pursuant to the CCRs. See 433 S.E.2d at 835. But D.R. Horton nonetheless contends that it need only maintain a "sufficient interest" in the property to enforce the CCRs against remote grantees and that various property interests it retains short of outright ownership satisfy this standard. ECF No. 1185 at 3–6. For example, it relies on the CCRs themselves, which explicitly provide that

> certain rights of the of the Declarant [(D.R. Horton)] set out in the declaration shall continue after the declarant no longer owns any of the property, including but not limited to the right of re-establishing its class B membership if and when it re-acquires any of the property or annexes additional land to the property.

Id. at 3 (emphasis omitted) (alteration added by D.R. Horton); see ECF No. 1074 at 2. In addition to its annexation right, D.R. Horton points to other property interests, including easement rights and "more tangible" rights in the neighborhood, like the "right to perform

---

[5] Though not raised by the parties, the court notes that "the relevant state's law of standing should be applied—in addition to federal standing law—in considering claims . . . that are derived from state law." Atlas Biologicals, Inc. v. Kutrubes, 50 F.4th 1307, 1326 (10th Cir. 2022) (collecting cases to support applicability of state standing law in federal court); accord Md. Shall Issue, Inc. v. Hogan, 971 F.3d 199, 219 (4th Cir. 2020). The court further notes that the inability of D.R. Horton to enforce a restrictive covenant against a remote grantee—under the rubric of state "standing" law—does not obviate Bardsley's Article III standing, as his allegations of roofing defects are sufficient to establish standing under federal law. See F.D.A. v. Alliance for Hippocratic Medicine, 602 U.S. 367, 380 (2024) (Article III standing requires (i) an "injury in fact," (ii) "caused . . . by the defendant," (iii) that would be "redressed by the requested judicial relief.").

maintenance and repairs on homes that do not meet community standards." ECF No. 1185 at 3, 5–6 (citing ECF Nos. 1074, 1185-1).

In support of its argument that the foregoing property interests are sufficient to confer standing to enforce the CCRs, D.R. Horton reads several South Carolina appellate opinions to displace the ownership requirement set forth in McLeod. ECF Nos. 1185 at 3–7, 1188-1 at 3–4.

The court agrees with Bardsley that these opinions raise closely related but distinct questions. ECF No. 1187 at 2. First, there is the question of what property interest is necessary for a grantor to enforce a restrictive covenant against a remote grantee—i.e., the standing question. Second, there is the question of what property interest is sufficient to allow a developer the unilateral right to amend restrictive covenants, which, as noted by Bardsley, is an issue not currently before the court. See id. at 2–3.

As already discussed, McLeod provides a direct answer to the first question: a grantor must "own[ ] real property" to have standing to enforce a restrictive covenant against a remote grantee. 433 S.E.2d at 835.

On the second question, in Queen's Grant II Horizontal Prop. Regime v. Greenwood Dev. Corp. the South Carolina Court of Appeals put forward five conditions that must be met for a developer to reserve the sole right to amend restrictive covenants, one of which being that "the developer, at the time of the amended or new covenants, must possess a sufficient property interest in the development[.]" 628 S.E.2d 902, 907 (S.C. Ct. App. 2006). That case involved a subdivision situated within a larger resort development suing the developer over a $175.00 road repair invoice, which the developer

assessed against the subdivision by amending restrictive covenants applicable to the subdivision. Id. at 907–11. Lending some credence to D.R. Horton's position, the court determined that the developer's "lack of a direct ownership interest" in the subdivision "in no manner impedes its continuing rights as Declarant under the 1972 covenants, including its ability to amend the covenants." Id. at 914. Other property interests held by the developer, "such as easements, rights of ways, and lands held in trust[,]" as well as its "obligation to maintain resort properties" and to fulfill "maintenance obligations," made it such that the developer's interest "did not evaporate when the last unit in [the subdivision] was sold." Id. at 914–15. The court found these property interests sufficient to allow the developer to amend restrictive covenants governing the subdivision, even though the developer no longer owned property in the subdivision that complained of the assessment.[6] Id. at 915.

The same issue—whether a developer retained the unilateral right to amend restrictive covenants—was before the court of appeals in AJG Holdings, LLC v. Dunn. 708 S.E.2d 218, 221–22 (S.C. Ct. App. 2011). The developer there argued that she maintained a sufficient property interest to amend the restrictive covenants over a subdivision simply by virtue of the restrictive covenants providing her with that very right. Id. The court rejected this "circular" argument and held that the property interest

---

[6] It is not entirely clear from the opinion whether the developer actually owned property within the larger resort that was outside the specific subdivision that had sued. See Queen's Grant II, 628 S.E.2d at 914 (noting that the developer maintained "unquestioned ownership of property" within the larger resort "well beyond the confines of [the subdivision].").

retained "must necessarily be something more than a purported reservation of [the] developer's rights." Id.

The Supreme Court of South Carolina subsequently affirmed the court of appeals' decision in a per curiam, published opinion. AJG Holdings, LLC v. Dunn, 764 S.E.2d 912 (Mem.) (S.C. 2014) To support its decision, the Court first quoted and emphasized the following language from Queen's Grant II: "the developer, at the time of the amended or new covenants, must possess a sufficient property interest in the development[.]" AJG Holdings, 764 S.E.2d at 912 (quoting Queen's Grant II, 628 S.E.2d at 907) (emphasis added in AJG Holdings). Then, the Court quoted and emphasized the following language from McLeod: "[A] grantor lacks standing to enforce a covenant against a remote grantee when the grantor no longer owns real property which would benefit from the enforcement of that restrictive covenant." AJG Holdings, 764 S.E.2d at 912 (quoting McLeod, 433 S.E.2d at 835) (emphasis and alteration added in AJG Holdings). Next, the Court quoted and emphasized a Georgia Supreme Court opinion for the proposition that a "developer of a subdivision who reserved the authority to waive restrictions in covenants running with the land no longer possesses that authority after divesting himself of his interest in the subdivision." AJG Holdings, 764 S.E.2d at 912 (quoting Armstrong v. Roberts, 325 S.E.2d 769, 770 (Ga. 1985)) (emphasis added in AJG Holdings).[7] Finally, the Court quoted and emphasized language from an order issued by the New York Supreme Court for Queens County (a trial court):

> A right reserved to release restrictions cannot be exercised after the reserver has conveyed all of his land and thus, used to ruin all of the property of

[7] In Armstrong, the Georgia Supreme Court appeared to adopt a rule that would preclude the defendant from exercising the right to waive restrictive covenants when the defendant had sold "the last lot [it] owned in the subdivision." 325 S.E.2d at 770.

> others who have bought and improved their land on the faith of the restrictions. Accordingly, the provision in the deed restrictions here involved, reserving to [the developer] the right to waive such restrictions by written consent, could be exercised by it only so long as it retained part of the tract in its possession.

AJG Holdings, 764 S.E.2d at 912 (quoting Richmond v. Pennscott Builders, Inc., 251 N.Y.S. 2d 845, 849 (Sup. Ct. 1964)) (emphasis and alteration added in AJG Holdings).

Given the Supreme Court's repeated emphasis on ownership of property, AJG Holdings appears to represent a departure from the court of appeals' approach in Queen's Grant II on the issue of what property interest is sufficient for a developer to retain the unilateral right to amend restrictive covenants. But whether AJG Holdings did in fact abrogate Queen's Grant II in this regard is a question the court need not answer because whether D.R. Horton has the right to unliterally amend the CCRs is not currently before the court. The question that is before the court is whether D.R. Horton retains a sufficient property interest in Heather Glen to enforce the CCRs against a remote grantee. AJG Holdings, of course, did nothing to disturb McLeod's rule that requires ownership of property to enforce a covenant against a remote grantee. Indeed, AJG Holdings, having favorably quoted and emphasized McLeod, only reinforces that property ownership is required to enforce a covenant against a remote grantee under South Carolina law. See AJG Holdings, 764 S.E.2d at 912. Both cases, moreover, represent the judgment of the state's highest court, and in the case of McLeod, on the precise issue currently before this court. For that reason, the court must apply the rule stated in McLeod. See Parkway 1046 v. U.S. Home Corp., 961 F.3d 301, 306 (4th Cir. 2020) ("It is axiomatic that in determining state law a federal court must look first and foremost to the law of the state's highest court, giving appropriate effect to all its implications.") (emphasis added); see

also Assicurazioni, Generali S.p.A. v. Neil, 160 F.3d 997, 1002 (4th Cir. 1998) (A prior decision of the state's highest court need not concern "identical facts to be clear," and "[i]t is enough that a fair reading of [the] decision . . . directs one to a particular conclusion.").

D.R. Horton's attempt to read a different standard from Queen's Grant II is ultimately unpersuasive because, first, it concerns a different issue and, second, because it is a decision from South Carolina's intermediate appellate court. Assicurazioni, Generali S.p.A., 160 F.3d at 1002 (explaining that only after looking to the decisions of a state's highest court "should a federal court seek guidance from an intermediate state court."). And to the extent that there is any doubt as to McLeod's continuing viability (and the court sees none), AJG Holdings' favorable view of the ownership requirement dispels any such doubt.

Because D.R. Horton has not shown that it "owns real property which would benefit from the enforcement" of the CCRs, the court concludes that it lacks standing under South Carolina law to enforce the arbitration provision therein against Bardsley, a remote grantee. See McLeod, 433 S.E.2d at 835; see also AJG Holdings, 764 S.E.2d at 912. Accordingly, the court will deny D.R. Horton's motion to compel arbitration as to Bardsley.[8]

[8] Because the court denies the motion to compel arbitration on this basis, it need not address the remaining arguments in the parties' supplemental briefing. Regarding the applicability of the FAA, the court notes that McLeod's property ownership requirement is not a rule designed to single out arbitration provisions for disfavored treatment. See Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687 (1996). As such, the arbitration provision in the CCRs would be unenforceable under McLeod regardless of the FAA's applicability.

## III. CONCLUSION

For the reasons set forth above, the court **DENIES** D.R. Horton's motion to compel arbitration as to Bardsley's claims against it, ECF No. 215.

**AND IT IS SO ORDERED.**

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**November 2, 2026**
**Charleston, South Carolina**